**CITY OF RYE, NEW YORK et al.,**
**Plaintiffs,**

v.

**Raymond T. SCHULER, as Commissioner, Department of Transportation, State of New York, et al., Defendants.**

**No. 73 Civ. 100.**

United States District Court, S. D. New York.

Feb. 13, 1973.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for plaintiffs City of Rye, Village of Bayville, Village of Mill Neck, Village of Lattingtown, Non-Partisan Civic Ass'n, Inc., Eden, Coates, Hazel L. Scudder, Saidie E. Scudder; Edward N. Costikyan and Robert S. Smith, New York City, of counsel.

John M. Conroy, Town Atty., Oyster Bay, N. Y., for plaintiff Town of Oyster Bay, New York.

Cravath, Swaine & Moore, New York City, for defendants William J. Ronan, as Chairman, Metropolitan Transportation Authority, and Metropolitan Transportation Authority; John R. Hupper and Norman J. Itzkoff, New York City, of counsel.

## OPINION

MacMAHON, District Judge.

This is an action to enjoin corridor public hearings which are required by federal law as a prerequisite for obtaining federal aid for state highways. The challenged hearings are concerned with the location of approach roads to a proposed bridge over Long Island Sound between Rye, New York, and Oyster Bay, New York.

Plaintiffs are several municipalities where the proposed roads may be located, several citizens with homes in the tentative paths of the approach roads, and a civic organization which opposed the proposed bridge. Defendants are the New York State Department of Transportation, the Metropolitan Transportation Authority of the City of New York ("MTA"), the state agencies responsible for the construction of the bridge and approach roads, and William J. Roman, chairman of the MTA.

Plaintiffs contend that the hearings should be enjoined until the Coast Guard and the United States Congress, if nec-

essary, approve the bridge and until defendants comply with regulations of the United States Department of Transportation ("Department") concerning the hearings.

## PRIOR PROCEEDINGS

The proposed bridge has caused a storm of controversy in New York State for many years, and this action is just one of many legal battles engendered by it.[1] Immediately after the commencement of this action, plaintiffs applied by order to show cause for a preliminary injunction.[2] It quickly appeared upon the hearing that the application raised troublesome questions of law, as well as issues of fact, requiring a plenary evidentiary hearing. Accordingly, we ordered that the trial on the merits be advanced and consolidated with the hearing on the application for a preliminary injunction, pursuant to Rule 65(a)(2), Fed.R.Civ.P.[3]

Defendants objected to the consolidation because they had not filed an answer. We overruled the objection, directed the entry of an answer containing a general denial and all affirmative defenses appearing from the evidence

presented. Rule 65(a)(2) explicitly permits a consolidation "Before or *after the commencement* of the hearing."[4] (Emphasis added.) Defendants have no cause for complaint so long as they are notified of the consolidation some time during the hearing, know that the trial has been advanced and consolidated with the hearing, and that it will be their only day in court.[5] We gave clear notice here, before any evidence was taken, and, moreover, reminded counsel before the close of the trial that this was their only opportunity to present evidence before final decision.

The consolidation was plainly warranted on three grounds. First, the only relief demanded by the complaint is the identical relief requested by the application for a preliminary injunction, i. e., that the hearings be enjoined until compliance by defendants with certain prerequisites. Second, the factual issues raised by the complaint are not only few and simple but identical with those which would be presented upon the trial; the issues were, therefore, susceptible of complete examination upon a trial on short notice and were, in fact, examined thoroughly at the trial.[6]

1. The bridge was originally authorized by New York State in 1967 by Public Authorities Law § 1266(9)(a) (McKinney 1967), McKinney's Consol.Laws, c. 43–A, and this statute was found to be constitutional by the New York State Court of Appeals. City of Rye v. Metropolitan Transportation Authority, 23 N.Y.2d 1015, 299 N.Y.S.2d 456, 247 N.E.2d 284 (1969). In 1971, legislation repealing Public Authorities Law § 1266(9)(a) was passed by the New York legislature, but was vetoed by the Governor. Litigation over the propriety of the Governor's veto is still continuing in the New York state courts. See City of Rye v. Ronan, 67 Misc.2d 972, 325 N.Y.S.2d 548 (Sup. Ct.N.Y.Co.1971), Order of Affirmance, November 21, 1972 (1st Dep't 1972) (notice of appeal filed January 5, 1973). In 1972, the legislature again repealed the legislation, but the Governor again vetoed the repeal legislation.

2. This action commenced by an order to show cause signed by us on January 5, 1973. A hearing was set for January 10, 1973 to determine whether a preliminary

injunction should issue. Upon the hearing of January 10, 1973, it became apparent that factual questions were involved. We then ordered an evidentiary hearing on those factual questions for the following morning, January 11, 1973, at 10:30.

3. Rule 65(a)(2), Fed.R.Civ.P., provides in pertinent part: "Before or after the commencement of the hearing of an application for a preliminary injunction, the court may order the trial of the action on the merits to be advanced and consolidated with the hearing of the application."

4. Securities & Exchange Comm'n v. Frank, 388 F.2d 486, 490 (2d Cir. 1968); 7 J. Moore, Federal Practice ¶ 65.04 (2d ed. 1972).

5. See Nationwide Amusements, Inc. v. Nattin, 452 F.2d 651 (5th Cir. 1971).

6. See Securities & Exchange Comm'n v. Frank, *supra*.

The first claim, that the Coast Guard and Congress, if necessary, should grant

Third, the consolidation saved the court and the parties a duplicitous second trial without prejudicing the rights of anyone.

While the trial did not raise difficult questions of fact, it did reveal troublesome questions of law concerning primary jurisdiction and exhaustion of administrative remedies. Due to inadequate public notice by defendants of the challenged corridor hearings, the instant application was necessarily so rushed that neither side was prepared to aid the court in resolving the difficult questions of law presented. It was, therefore, necessary to stay the corridor hearings pending decision in order to give the court time to research, study and consider the questions raised.

We turn, now, to the merits of this action.

Defendants began consideration of the bridge project in August 1972. Yet, after a four-month delay and without any apparent urgency or reason for not waiting another month, they first published notice, on December 18, 1972, of corridor hearings scheduled for January 15 and 17, 1973. The published notice was not only two days' short of the thirty days' notice required by the applicable procedure,[7] but, as a practical matter, was further shortened by inclusion of the long Christmas and New Year weekends within the interim twenty-eight day period. The curtailed notice, we think, was inexcusable in light of the unmistakeable purpose of corridor hearings to:

"afford full opportunity for effective public participation in the considera-

tion of highway location and design proposals by highway departments before submission to the Federal Highway Administration for approval. They provide a medium for free and open discussion and are designed to encourage early and amicable resolution of controversial issues that may arise."[8]

We find that "full opportunity for effective public participation" and "free and open discussion" were substantially thwarted, if not deliberately precluded, by defendants' dubious tactics.

## ADMINISTRATIVE STRUCTURE AND PROCEDURES

The questions of law raised here cannot be understood nor resolved without reference to the context of the administrative structure and procedures in which they arise. The Department administers federal aid to states for highway construction through the Federal Highway Administration ("FHWA").[9] The first step to obtaining federal aid for highways is the submission of a general state program for the use of the funds to the Department.[10] After the Department approves the general program, funds are allocated and the state commences to develop specific plans for projects.[11]

Congress specifically provided for public hearings before the state committed itself to any one plan to ensure public participation in the development of these plans and public comment upon the social and environmental effects of projects. Thus, the governing statute, 23

their approval of the bridge before any hearings on the approach roads should be permitted, raises simply the legal question of whether the approvals must be obtained before the hearing.

The second claim, that the regulations of the Department have not been followed, raises simply questions of fact. The parties stipulated to nearly all of the facts, and only slight disagreement existed over a small number of documents.

7. Policy and Procedure Memorandum 20–8, Public Hearings and Location Approval ("PPM 20–8"), ¶ 8.a(1), 23 C.F.R. 1, App. A, Jan. 1, 1972; Rule 6, Fed. R.Civ.P.

8. PPM 20–8, ¶ 1.

9. 23 U.S.C. § 101 et seq.; 33 C.F.R. 1.1 et seq., Jan. 1, 1972.

10. 23 U.S.C. §§ 104, 105, 302.

11. 23 U.S.C. § 106; 33 C.F.R. 1.10, Jan. 1, 1972.

U.S.C. § 128, provides that whenever a highway involves the

"bypassing of, or going through, any city, town, or village, either incorporated or unincorporated (the state highway department), shall certify to the Secretary that it has had public hearings, or has afforded the opportunity for such hearings, and has considered the economic and social effects of such a location, its impact on the environment, and its consistency with the goals and objectives of such urban planning as has been promulgated by the community." [12] (Hereafter "§ 128 hearing.")

Moreover, because the decision to build an approach road to a bridge has a major impact on the environment, the Department is further required to prepare an environmental impact statement to ensure compliance with the provisions of the National Environmental Policy Act of 1969 ("NEPA"), Section 102, 42 U.S.C. § 4332(2)(C). In order to ensure orderly compliance with the § 128 hearing and with NEPA, the Department has issued policy and procedure memoranda providing complex regulations which direct each step that the state must take in holding hearings on the development of its plans and the environmental impact statement. Two memoranda have been issued. The first [13] gives the procedure for approval of the location and design of highways. The second [14] gives the procedure for compliance with the NEPA requirements.

As soon as the state commences consideration of specific locations for a project in its program, it must solicit comments on the locations which it is considering from all possibly interested federal, state and local governments, as well as from private groups and individuals.[15] When the state has received such comments, it is then required to consider possible locations for the highway and to gather environmental data on those locations.[16] The state then chooses tentative locations and evaluates the effect of the project on the environment in a draft environmental impact statement which it prepares.[17] If the draft impact statement is approved by a representative of the FHWA division office, it must be made available to the public for comment and copies of it must be sent to specified individuals and groups.[18]

The state is required to give notice of a public hearing on the possible location considered in the draft impact statement,[19] and the notice must inform the public of the availability of the draft impact statement, as well as certain other materials for their inspection and copying in preparation for the hearing.[20]

After the location hearings, the state publishes notice of its choice and of the materials supporting its selection.[21] The state then submits its preferred location to the Department. The Department's approval depends upon the actions of two officials, one responsible for ensuring compliance with the location hearings PPM 20–8, and the other responsi-

---

12. 23 U.S.C. § 128.

13. PPM 20–8.

14. Policy and Procedure Memorandum 90–1, Environmental Impact and Related Statement ("PPM 90–1"), 37 F.R. 21809, Oct. 14, 1972.

15. PPM 20–8, ¶ 5.a; PPM 90–1, App. C.

16. PPM 90–1, ¶ 6.a(1) and App. C.

17. PPM 90–1, ¶ 6.b.

18. PPM 90–1, ¶ 6.c, d and e. The draft environmental impact statement will be referred to as "the draft impact statement."

19. PPM 20–8, ¶ 8.a; PPM 90–1, ¶ 6. The hearing is referred to as a "corridor public hearing" in PPM 20–8 and as a "location public hearing" in PPM 90–1. We shall refer to it as a "location public hearing."

20. PPM 20–8, ¶ 8.a(3); PPM 90–1, ¶ 6.e. The exact requirements for material to be made public is crucial to plaintiffs' second claim and will be discussed in detail below.

21. PPM 20–8, ¶ 10.c.

ble for ensuring compliance with NEPA PPM90–1.

The Division Engineer of the FHWA is responsible for compliance with the location hearings procedures under PPM 20–8. He may approve the location recommended by the state only after (1) the location hearings have been held in conformity with departmental policy; (2) transcripts of the hearings have been submitted to him; and (3) all requirements of departmental policy have been met.[22] The other official is the Regional Federal Highway Administrator to whom a final environmental impact statement must be submitted for approval after the location hearing.[23]

There is no reference in any of the applicable statutes, regulations or memoranda to any public participation in the Department's approval process of the state's choice of locations other than as the public's views are reflected in the comments and the documents set forth in the transcript of the hearings. There is no review process whatsoever for prohibition from, or correction of, procedural or other irregularities which may occur before the hearings.

Once the approval of the Division Engineer and the Regional Federal Highway Administrator have been obtained, the state may then begin design engineering under applicable federal instructions, but before the state is committed to a specific design proposal, it must hold another public hearing on its tentative design proposals.[24] Following this design hearing, the Division Engineer may approve the design if all the requirements of departmental procedure have been followed.[25]

If, for any reason, after the completion of a location or design hearing, there is a change in the proposal that would have a "substantially different social, economic, or environmental effect," then another public hearing must be held and another impact statement must be drafted.[26]

The Department may not give its final approval for the project until all the location and design hearings and work have been completed. The United States is not legally obligated to complete the project until the Department has given its final approval.[27] This legal obligation is void, however, if departmental procedures set forth in the policy and procedure memoranda have not been followed.[28]

Finally, before the bridge can be built, it must be approved by the Coast Guard,[29] and, if the bridge requires a causeway, congressional approval is also necessary.[30]

## JURISDICTION

This action challenges the approach roads location hearings. Defendants have submitted tentative alternative location plans for the approach roads along with various proposals for the bridge itself in order that the full im-

22. PPM 20–8, ¶ 9.d(1).

23. PPM 90–1, ¶ 6.j. The Regional Federal Highway Administrator may approve the final impact statement only after ninety days have elapsed from the release of the draft statement and thirty days have elapsed from the release of the final statement.

24. PPM 20–8, ¶ 6.

25. PPM 20–8, ¶ 10.a(2).

26. PPM 20–8, ¶¶ 7.c and 8; PPM 90–1, ¶ 3.b. However, the submission of the design plans and the holding of the design hearings, alone, are not grounds for the issuance of a further impact statement.

27. 23 U.S.C. § 106.

28. 33 C.F.R. 1.9, 1.37, Jan. 1, 1972.

29. 49 U.S.C. § 1655(g); 33 C.F.R. 113 et seq., Jan. 1, 1971. The Commandant of the Coast Guard approves the applications for bridges after an application procedure and optional hearing procedure described in the regulations have been followed. The exact procedure applicable to the approval of the bridge application makes no mention of highway application and, therefore, is not relevant here.

30. 33 U.S.C. § 401.

pact of the entire project may be considered. They have not, however, obtained the approval of the Coast Guard or Congress for any specific proposal.

The threshold question is whether we should exercise jurisdiction over plaintiffs' claims. There is no doubt that plaintiffs have alleged violation of federal rights under 23 U.S.C. § 128 and that the amount in controversy is more than $10,000.[31] They have, therefore, properly invoked jurisdiction of this court under 28 U.S.C. § 1331. There remain, however, questions of whether the Department has primary jurisdiction over the issues involved and whether plaintiffs have exhausted all administrative remedies. Consideration of those questions is foreclosed, however, if no opportunity for administrative appeal or review is open to plaintiffs. In that case, neither the doctrine of primary jurisdiction nor exhaustion of remedies precludes our consideration of a case.[32]

In Rosado v. Wyman,[33] the Supreme Court applied this principle. There, plaintiffs, who were on welfare, claimed that a New York state law curtailing the rights of welfare recipients was inconsistent with the federal laws regulating welfare. The Department of Health, Education and Welfare ("HEW") had the power to withdraw federal welfare funds if it found that a state law were inconsistent with federal laws. At the time of the suit, HEW was independently considering the withdrawal of federal welfare funds from New York because of the challenged New York statute.

However, "since HEW has no procedures whereby welfare recipients may trigger and participate in the Department's review of state welfare programs," [34] neither the doctrine of primary jurisdiction nor the doctrine of exhaustion of administrative remedies would preclude the district court from considering plaintiffs' claims. Moreover, the Court held that the independent review of the statute by HEW was immaterial.[35]

In Barrera v. Wheeler,[36] plaintiffs, school children and their parents, claimed that benefits due to them under Title I of the Elementary and Secondary Education Act of 1965 ("Education Act") [37] were being improperly denied to their schools. The Education Act provides that the Office of Education, a bureau of HEW, grants aid to states to spend in accordance with federal regulations. If a state fails to adhere to the regulations, the Office of Education can commence a hearing to eliminate the aid to that state. No provision existed for the participation of the children or parents in the review of the alleged state noncompliance. One regulation,[38] however, required that the state forward to the Office of Education any complaint from a citizen about the federal-aid program. The United States Court of Appeals for the Eighth Circuit found that the forwarding of complaints only served to provide information for the Office of Education and not to create a procedure for the filing and processing of complaints before the Office. The Barrera court found, therefore, that *Ro-*

---

31. Defendants claim that the amount in controversy is less than $10,000. Beyond dispute, the approach roads and the bridge involve more than $10,000.

Plaintiffs also contend that 28 U.S.C. § 1343(4), which confers jurisdiction over any "Acts of Congress for the protection of civil rights," is applicable here. They contend that 23 U.S.C. § 128, which provides for public hearings before approval of a federally-aided highway project, is a civil rights statute. We find that contention of doubtful validity. *See* Mattingly v. Elias, 325 F. Supp. 1374 (E.D.Pa.1971). We need not pass upon the question, however, because we have jurisdiction to consider the issues raised here.

32. Rosado v. Wyman, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970); Barrera v. Wheeler, 441 F.2d 795 (8th Cir. 1971).

33. 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed. 2d 442 (1970).

34. Rosado v. Wyman, *supra*, 397 U.S. at 406, 90 S.Ct. at 1215.

35. *Id.*

36. 441 F.2d 795 (8th Cir. 1971).

37. 20 U.S.C. §§ 241a–241m, 242.

38. 45 C.F.R. 116.31.

*sado* applied and permitted plaintiffs to litigate their claim in the district court, without resort to the Office of Education, because there were "no prescribed agency procedures or remedies to exhaust." [39]

Consideration of the entire administrative structure of FHWA [40] compels us to conclude that there is no administrative path of appeal or review open to plaintiffs. It is clear that there is no provision whatsoever for review of actions of state officials in scheduling and noticing a location hearing. The only conceivable review comes after the hearing when the state is required to publish notice of the location that it has chosen and of the availability of supporting papers. It then submits its preferred location and a transcript of the hearing, among other papers, to the Division Engineer. He is supposed to deny approval of the location if departmental policy has been violated, but there is no provision even for submission, much less advocacy, of complaints about the procedure to the Division Engineer except as they may appear in the voluminous transcript or in the written comments upon the location received before the hearing. There is, therefore, no direct route for participation of interested parties or the public in the review process.[41]

■ There are always informal routes of appeal,[42] and the reading of objections into the transcript might arguably be a form of appeal. Both of those procedures, however, are similar to those rejected in *Barrera*. They merely give notice of possible problems which may, or may not, be considered by the Division Engineer. They do not create a procedure with a record of complaints filed and an orderly method of processing or advocating them. Thus, at best, the post-hearing procedures are inadequate. There is, therefore, no opportunity for review open to plaintiffs, and, consequently, neither the doctrine of primary jurisdiction nor exhaustion of remedies precludes our consideration of this action.

Even if we were to assume that there are adequate post-hearing procedures, they would be of little aid to plaintiffs for two reasons. First, plaintiffs would be effectively deprived of presenting their side of the case to an uncommitted and impartial state agency. A major purpose of the hearing is to solicit public comment *before* the state has committed itself either to a particular location or to a draft impact statement.[43] After the hearing, regardless of how defective procedurally, the state will have committed itself to one position. The

---

39. Barrera v. Wheeler, *supra*, 441 F.2d at 800.

40. In *Rosado*, the Supreme Court noted that the district court should attempt to ascertain the view of HEW in order to benefit from the expertise of the federal agency primarily concerned with such problems. We have not sought the views of the Department for two reasons. First, while we believe that it is appropriate to delay the hearings for the short time necessary to decide this case, we believe that it is inappropriate to delay them the much longer time required to ascertain the views of the Department. Second, and more important, the issues presented to us are sufficiently clear that we can look to the Department's published views and apply them.

41. The purpose of the notice of the choice of location and supporting docu-
ments appears to be simply to inform the public of the results of the hearing. The absence of a formal appeal procedure in an otherwise comprehensive set of procedures cannot be inadvertent. Similarly, there is no provision for public participation in review of the draft impact statement after the hearing. The Regional Federal Highway Administrator must wait thirty days after submission of the final report before approving it, but no reference is made even to submission of comments to him during that time.

42. *E. g.*, Road Review League, Town of Bedford v. Boyd, 270 F.Supp. 650 (S.D. N.Y.1967) (history of telephone calls and letters to Department officials to influence outcome is recorded).

43. See text for n. 15.

state might have made either no commitment, or a different commitment, had plaintiffs been able to present more information as they might have had the state complied with departmental policies.

However, even if the procedural deficiencies were discovered and a new hearing scheduled, the information which might have had a significant impact on a first hearing might have no impact whatsoever on a subsequent hearing. The state officials would face a difficult task trying to be uncommitted after they had already committed themselves publicly. While they could strive to be uncommitted, we seriously doubt that human nature would afford plaintiffs "effective participation" the second time around.

Second, plaintiffs' cause could suffer irreparable political injury. The failure of defendants to provide them with material to which they have a right under departmental policy might result in their presentation of a weak case at the hearing. Given the many speakers and the presence of the press, plaintiffs' weaker case could receive adverse publicity. A second hearing, conducted under all the proper procedures, but of necessity much later in time, might not restore the political losses they might sustain because the first hearing was held in violation of their federal statutory rights.

■ We conclude, therefore, that the only way to ensure plaintiffs full opportunity for effective public participation in the consideration of the highway location through free and open discussion [44] is to provide a pre-hearing remedy to resolve procedural deficiencies. Unquestionably, the Department has the power to create an appeal process for interest-

ed parties, but it has not done so, and, just as the HEW's failure to devise an appeal process necessitated the district court's intervention in agency procedure in *Rosado* and *Barrera,* the Department's failure to create an appeal process here has also compelled our intervention.

## ALLEGED VIOLATIONS OF DEPARTMENTAL PROCEDURE

Plaintiffs' first claim is that the location hearings may not legally proceed until defendants have first obtained approval of the' bridge from the Coast Guard and Congress, if necessary. Upon oral argument, plaintiffs' counsel conceded that he knew of no authority to support this proposition; neither do we. A careful review of the statutes and regulations authorizing the federal-aid program to highways and approval of bridges reveals no law to support plaintiffs' first claim.

■ There is no statute or regulation specifying congressional or departmental policy that approval of a bridge by the Coast Guard and Congress should precede location hearings on approach roads.[45] The only reference to a project where there is also a need for approval of a bridge by the Coast Guard in the relevant statutes, regulations or policies occurs in the NEPA PPM 90–1.[46] There, the Department envisions that the state highway department would be responsible for the impact statement covering both the highway and the bridge over navigable waters. If anything, this PPM argues for the procedure used here by defendants because it speaks of the state highway department as the "lead" agency which presumably should decide the order of procedure.[47]

---

44. See n. 8.

45. Compare Rosado v. Wyman, supra.

46. PPM 90–1, ¶ 5.f.

47. Arguably, the policy and procedure memorandum envisioned long highways with short bridges, not, as in this case, long bridges and short highways. Assuming this, we still cannot deduce any de-

partmental policy requiring the Coast Guard to draft the impact statement and thus approve the bridge before the location hearings. If anything, we would find the departmental policy to be the contrary.

PPM 20–8 explicitly requires location hearings to be held before the state is committed to any one location. To re-

There are no cases indicating anything to the contrary. Plaintiffs submitted one case after trial in support of this contention. Monroe County Conservation Council v. Volpe, 472 F.2d 693 (2d Cir. 1972).[48]

Defendants here desire only to hold the first of two hearings to determine which locations and which design they should choose to submit to the federal government for approval. They are powerless to obligate the federal government to anything. This case, therefore, is far from even nearing the point of legal commitment by the United States, the particular action attacked in *Monroe County*. *Monroe County* only requires Coast Guard and congressional approval, if necessary, sometime during, or after, all the hearings are concluded and all the papers are submitted, but before final departmental approval. It has no bearing on the necessity for approval before any particular hearing or submission of papers.

We conclude, therefore, that all of plaintiffs' arguments about the order of the hearing and the approvals are better addressed to defendants, to the FHWA informally, and to the Division Engineer

via the record at the hearing. We have no legal authority with which to evaluate, much less condemn, defendants' scheduling the location hearings before obtaining approvals for the bridge.

Plaintiffs' second claim alleges three violations of departmental procedure for location proceedings. Consideration of these three claims requires some review of the purpose of the location hearings and preliminary procedures. The purpose of the hearing and the pre-hearing procedures is explicitly stated in PPM 20–8, as follows:

1. *Purpose.* The purpose of this PPM is to ensure, to the maximum extent practicable, that highway locations and designs reflect and are consistent with Federal, State and local goals and objectives. The rules, policies and procedures established by this PPM are intended to afford full opportunity for effective public participation in the consideration of highway location and design proposals by highway departments before submission to the Federal Highway Administration for approval. They provide a medium for free and open discussion and are designed to encourage early and ami-

---

quire approval of the bridge before the location hearings would either require the Coast Guard to approve every possible location to be considered at the hearing or the commitment of the state to one or few locations in violation of the policy of the Department. Either of these alternatives is clearly less consistent with the overall scheme of highway development than having the location hearing on the approach roads before the Coast Guard or congressional approvals of the bridge.

Plaintiffs contend that the provision of the NEPA PPM 90–1 defining "highway section" supports their claim. "Highway section" is defined as a "length of highway between logical termini." PPM 90–1, ¶ 3.a. Plaintiffs contend that because the bridge has not been approved, there is no logical second terminus. The argument is specious. The purpose of requiring two termini is to make discussion of proposed highways intelligible. Defendants have proposed termini that fulfill this require-

ment. To require specific approval of the bridge in order to fulfill plaintiffs' interpretation of the definition of "highway" would again place defendants in the dilemma of having to commit themselves or obtain approval of all possible locations. This result would make a definitional section of the NEPA PPM 90–1 control the substantive purpose of the location hearings PPM 20–8. The definition of "highway section" is, therefore, of no aid to plaintiffs.

48. It is, however, inapposite. *Monroe County* established only that the Department may not legally obligate funds to pay for a bridge on a federal highway before approval for the bridge has been obtained from the Coast Guard. Even assuming that *Monroe County* could be extended to stand for the proposition that no final approval could be given for funds for approach roads to bridges not yet approved by the Coast Guard, it would still not affect this case.

cable resolution of controversial issues that may arise.

The PPM requires State highway departments to consider fully a wide range of factors in determining highway locations and highway designs. It provides for extensive coordination of proposals with public and private interests. In addition, it provides for a two-hearing procedure designed to give all interested persons an opportunity to become fully acquainted with highway proposals of concern to them and to express their views at those stages of a proposal's development when the flexibility to respond to these views still exists." [49]

The § 128 hearing and pre-hearing procedures, as described in location hearings PPM 20–8, have been held to be a "fundamental right" of great importance. In D. C. Federation of Civic Associations, Inc. v. Volpe,[50] the Court of Appeals for the District of Columbia Circuit commented at length about the purpose and importance of the § 128 hearing:

"Those who are concerned with and most immediately affected by federal highway projects have been accorded an opportunity to both commend and criticize planned highway construction projects, projects which are inherently disruptive of the status quo in any community. . . .

These provisions of Title 23 are the only form of direct citizen participation in decisions about the construction of massive freeways, decisions which may well have more direct impact on the lives of residents than almost any other governmental action. Public hearings are the forum ordained by Congress in which citizens . . . participate in highway planning decisions. The Supreme Court has made it clear in a series of cases that the right of effective participation in the political process 'is of the essence of a democratic society, and any restrictions of the right strike at the heart of representative government.' These rights, according to the Court, are 'individual and personal,' they touch a 'sensitive and important area of human rights,' and they involve the 'basic civil and political rights' of citizens." [51]

Keeping the purpose and importance of the hearings in mind, we now turn to the three claimed violations of departmental procedure.

■ Plaintiffs' first alleged violation is that the comments required to be solicited by the location hearings PPM 20–8 were improperly solicited. We agree. Defendants solicited comments from numerous sources as to the draft environmental impact statement required by NEPA PPM 90–1. They did not, however, solicit any other comments. Unfortunately, they assumed that by fulfilling the requirements of NEPA PPM 90–1, they were also satisfying the requirements of location hearings PPM 20–8. They were not.

Location hearings PPM 20–8, ¶ 5.a, requires:

"When a state highway department begins considering the development or improvement of a traffic corridor in a particular area, it shall solicit the views of that State's resources, recreation, and planning agencies, and of those federal agencies and local public officials and agencies, and public advisory groups which the State highway department knows or believes might be interested in or affected by the development or improvement."

The purpose of the solicitation of the views of the specified state agencies before consideration of a location is to "provide for extensive coordination of proposals with public and private interests." [52] The goal is for defendants to receive full information about the

---

49. PPM 20–8, ¶ 1.

50. 140 U.S.App.D.C. 162, 434 F.2d 436, 441 (1970).

51. *Id.*

52. See n. 49.

project before any decisions have been made. Such solicitation is required to be commenced as soon as the state commences consideration of a location and before any environmental data is even considered or set forth in a draft environmental statement. After the first draft is prepared, a second set of comments must be solicited for the draft impact statement. Appendix C to the NEPA PPM 90–1.

Defendants have short circuited this procedure. They have ignored the requirements of the location hearings PPM 20–8 by only requesting comments on the impact statement. This request is palpably insufficient for two reasons. First, the comments are encouraged only as to the environmental factors raised in the impact statement; it is not clear that the comments should include economic, social and urban planning factors specified in § 128.[53] Second, the comments are received too late to serve as a basis for evaluating the environmental data to be set forth in the draft environmental statement and the data used in choosing tentative locations. The state, therefore, would be making tentative environmental and location decisions without the required comments of specified agencies and groups. The entire coordination purpose of the location hearings PPM 20–8, therefore, would be thwarted.[54]

Plaintiffs' second alleged violation is that defendants have denied them certain information which must be made available to them. The location hearings PPM 20–8, ¶ 8.a(3), requires that "pertinent information developed by the State highway department" be made available for public inspection and copying. Defendants released only the draft environmental impact statement along with a summary of the statement and two short press releases to fulfill this requirement. Again, they erroneously assumed that by fulfilling the requirements of the NEPA PPM 90–1, they had satisfied the requirements of the locations hearings PPM 20–8.

In order to "afford full opportunity for effective public participation"[55] in consideration of the highway approaches and the bridge, defendants must release to the public not only the one document that they had prepared for public consumption on the environmental factors, but also other documents prepared for use by defendants in support of their decision about tentative locations. Defendants, however, have not even revealed at least six documents, or the updates of documents, developed by them, which concededly contain "pertinent information."[56] Considering that these hearings involve "decisions that may well have more direct impact on lives of residents than almost any other governmental action,"[57] there can be no excuse for defendants' failure to comply with the letter, not to mention the spirit, of the law requiring disclosure of pertinent information.

---

53. Title 23, United States Code, Section 128, states that the state highway department shall consider "the economic and social effects of such a location, its impact on the environment, and its consistency with the goals and objectives of such urban planning as has been promulgated by the community." The comments that are to be solicited, therefore, should be directed to all the areas that the state highway department must consider.

54. We also note that defendants permitted all comments to be sent in by January 31, 1973, two weeks after the hearings were to be concluded. If the comments are to be received before a draft impact statement is to be written, it is obvious that the last date for receiving them cannot be after the location hearings. Even the second solicitation on the draft impact statement should be received before the location hearing. PPM 90–1, ¶¶ 6.c and 6.f, make clear that the draft statement must be circulated at least thirty to forty days before the hearing and that, with one exception, the state must allow thirty days plus mailing time for those interested to submit comments.

55. See n. 49.

56. Exhibit 1, Draft Environmental Impact Statement, at 318.

57. See n. 51.

Plaintiffs' third alleged violation is that the notice of the hearings is insufficient. We agree. The portion of location hearings PPM 20–8 specifying the requirements of the notice states:

"The notice of public hearing shall specify that maps, drawings, and other pertinent information developed by the State highway department and written views received as a result of the coordination outlined in Paragraph 5.a will be available for public inspection and copying and shall specify where this information is available; namely, at the nearest State highway department office or at some other convenient location in the vicinity of the proposed project." [58]

Despite these explicit instructions, the notice here stated only that:

"Further information relative to the project may be found in the said Draft Environmental Section 4(f) Statement and the written views received thereon which are available for public inspection at the following offices (addresses of many offices follows)."

It is evident that defendants' mistake as to the first two violations has been made here once again. While the notice is sufficient to comply with NEPA PPM 90–1, it fails to comply with the notice requirements as to location hearings PPM 20–8. The notice must specify the place where all the comments required to be solicited and all the pertinent information received can be obtained. Defendants' violation of the notice requirement, therefore, is co-extensive with their violation of the substantive requirements to solicit comment and to make available pertinent information.

We conclude, therefore, that defendants have failed to comply both with the substantive and procedural requirements of the applicable federal law and regulations and that plaintiffs will suffer irreparable injury unless the injunction sought is granted.

Accordingly, we find that plaintiffs are entitled to a permanent injunction enjoining the location hearings until defendants have complied with the substantive and procedural requirements of 23 U.S.C. § 128, PPM 20–8, and PPM 90–1. We grant plaintiffs' motion for a preliminary injunction enjoining the holding of location hearings until a judgment for a permanent injunction, not inconsistent with this opinion, is issued.

The foregoing opinion constitutes this court's findings of fact and conclusions of law, as required by Rule 52, Fed.R. Civ.P.

Settle an order and judgment within twenty (20) days from the date of this opinion.